**UNITED STATES of America for the Use and Benefit of BALBOA INSURANCE COMPANY, Assignee, Plaintiff-Appellant,**

v.

**ALGERNON BLAIR, INC., et al., Defendants-Appellees.**

No. 85–4571.

United States Court of Appeals, Fifth Circuit.

July 25, 1986.

Andrew I. Brown, New Orleans, La., for plaintiff-appellant.

Leonard Schaitman, Dept. of Justice, Civ. Div., Katerine S. Gruenheck, Washington, D.C., for amicus curiae.

Dominick, Fletcher, Yeilding, Acker, Wood & Lloyd, Terry McElheny, H.L. Ferguson, Jr., Birmingham, Ala., Karl E. Boellert, Lake Charles, La. for defendants-appellees.

Before BROWN, REAVLEY and JONES, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal arises out of a dispute between contractors on a federal construction project. Out of a rich Louisiana gumbo containing the Miller Act, the Small Business Association Surety Bond Guarantee Program, and state suretyship law, the District Court detected the bitterness of the ancient doctrine of champerty and dismissed the plaintiff's case as violative of public policy. We have subjected the identical recipe to our appellate palate and have found the concoction to be both savory and nutritious. We therefore reverse.

### Building Barracks

On a construction project, a contractor guarantees that it will perform its responsibilities by obtaining a performance bond in favor of its employer, either the owner if the contractor is a prime contractor, or another contractor if the contractor is a subcontractor. In turn, an unpaid supplier of labor or materials on a construction project can assure that it will ultimately be paid by securing a mechanic's lien against the improved property. Such a lien, however, cannot be filed against property belonging to the United States. To provide an effective remedy for those who supply labor or material to a contractor on a federal construction project, Congress passed the Miller Act, 40 U.S.C. § 270a *et seq.* Under the Miller Act, a government contractor must post a payment bond, 40 U.S.C. § 270a(a)(2), and any person who furnishes labor or materials and who has not paid in 90 days may bring suit on the bond for the unpaid balance. 40 U.S.C. § 270b(a).

Keeping this background in mind, we come to the facts of the present case. In 1976, the United States Department of the Army, acting through the Corps of Engineers, awarded two large contracts for the construction of military housing facilities at Fort Polk, Louisiana. The two projects, referred to by the parties as Phase I and Phase II, respectively, were the construction of an Enlisted Men's Barracks and the construction of an Enlisted Men's/Enlisted Women's Barracks.

The successful bidder on the projects was Algernon Blair, Inc. (Blair). Blair, as prime contractor, subcontracted the mechanical portion of Phases I and II to Ball-Co Contractors, Inc. (Ball-Co) of Bay Minette, Alabama. Ball-Co in turn subcontracted a portion of the mechanical work, the automatic temperature control system work, to Pre-Engineered Products Company, Inc. (Pre-Engineered) of Shreveport, Louisiana.

Consistent with the Miller Act, Blair furnished payment bonds with United States Fidelity and Guaranty Company (USF & G) as surety. Ball-Co furnished bonds guaranteeing both its performance and its payment of suppliers with eight individuals as sureties. Pre-Engineered furnished three different subcontract bonds securing its performance of the subcontracts and the payment of its suppliers with Balboa Insurance Company (Balboa) as surety. Pre-Engineered's bonds were executed in favor of Ball-Co and stated that if Pre-Engineered did not fulfill all the terms and conditions of its contracts or did not pay for all the labor and materials furnished, then Balboa would be liable to Ball-Co for the "penal sum" stated in the bonds.

To summarize in schematic form, the relationship between the owner, the contractors, and their sureties look like this:

| Entity | Surety |
| --- | --- |
| Corps (owner) | |
| Blair ..................... (prime contractor) | USF&G |
| Ball-Co ..................... (mechanical subcontractor) | 8 individuals |
| Pre-Engineered ............. (temperature control sub-subcontractor) | Balboa |

*SBA Enters the Picture*

As part of the consideration for Balboa's bonds, Pre-Engineered entered into a typical indemnity agreement with Balboa by which Pre-Engineered agreed to indemnify Balboa for any loss which Balboa might suffer as the result of its surety agreement in favor of Ball-Co. In addition, Balboa entered into a guaranty agreement with the Small Business Administration (SBA) by which the SBA guaranteed 90% of Balboa's losses incurred in connection with the bonds written for Pre-Engineered in favor of Ball-Co.

Balboa's guaranty agreement with the SBA was executed pursuant to the SBA's Surety Bond Guarantee Program. The purpose of this program is to enable small business concerns—typically minority-owned, as Pre-Engineered was—to participate in the construction industry through the SBA issuing partial guarantees on bid, performance, and payment bonds. The bonds themselves are furnished by private sector sureties such as Balboa who might be unwilling to issue the bonds in the absence of the SBA's partial guarantee.

Under the program, the SBA is authorized to guarantee up to 90% of a participating surety's loss sustained when an eligible small business principal breaches the terms of a bid, performance, or payment bond. "Loss" is defined by the program regulations to include all liability, damages, expenses, and attorney's fees which the surety may incur as a consequence of having executed the guaranteed bonds. If the surety incurs a loss for which it is (partially) reimbursed by the SBA and subsequently recovers all or a portion of the loss, either from the principal or a third person, then the surety must turn over such "salvage proceeds" to the SBA up to the point that the SBA is fully reimbursed.[1]

*Controversy Sets In—Balboa Steps/Falls In*

Work on Phases I and II of the Fort Polk project began at approximately the same

---

1. Similarly, the standard agreement between the SBA and the participating sureties provides that

any reimbursement for losses paid by the SBA under the program may be reduced pro rata for

time. In April of 1978, a dispute arose between Ball-Co and Pre-Engineered,[2] and Pre-Engineered removed its workforce from the jobsite. Ball-Co notified Balboa that Ball-Co considered Pre-Engineered to be in default. Balboa investigated the status of the Fort Polk projects with the assistance of a consulting engineering firm, and a representative of Balboa met with Ball-Co to discuss completion of the projects.

What happened next is disputed. Ball-Co maintains that Balboa agreed to assume responsibility for both Phases I and II using Pre-Engineered as its labor force. Balboa asserts that Pre-Engineered returned to the job to complete its contract with Ball-Co and that Balboa merely monitored Pre-Engineered's progress and advanced the necessary operating funds. In any event, Pre-Engineered returned to work under an agreement with Balboa whereby Balboa loaned to Pre-Engineered the necessary monies to continue work on the projects. In exchange, Pre-Engineered assigned its rights (but not its obligations) under the subcontracts to Balboa. Ball-Co acknowledged these assignments and forwarded all further payments of Pre-Engineered's invoices to Balboa in its status as Pre-Engineered's assignee. In a separate contemporaneous agreement, Pre-Engineered reiterated and confirmed its agreement to reimburse Balboa for any and all expenses incurred by Balboa on Pre-Engineered's behalf.

After Pre-Engineered returned to the jobsite, disputes continued between it and Ball-Co, but Pre-Engineered remained on the job until its work was completed. The matter of the nonpayment of the invoices that led to Pre-Engineered's April 1978 removal of its workforce remained, however. In September 1979, Balboa filed a Miller Act claim for amounts allegedly due on Phase II and in December 1980, Balboa filed a similar claim to recover amounts allegedly due on Phase I. The named defendants were Blair, Blair's surety USF & G, Ball-Co, and Ball-Co's individual sureties.[3]

The two suits were consolidated and Ball-Co filed a counterclaim in each against Balboa. After the close of all of the evidence in the bench trial, the defendants renewed an earlier motion to dismiss Balboa's suits. After consideration of briefs on the motion to dismiss, the District Court granted the motion.

*District Court's Conclusion: Public Policy, Ethics, and Standing Enter the Picture*

The District Court found that Balboa was authorized to bring the Miller Act claims in its capacity as Pre-Engineered's assignee, but it also found that Balboa's suits should be dismissed as a violation of public policy. It held that since Balboa's suits were being prosecuted in its capacity as Pre-Engineered's assignee and since 90% of Balboa's "losses," including the attorney's fees and court costs involved in the present litigation, were being reimbursed by the SBA, then the SBA was funding Balboa's litigation in Balboa's capacity as Pre-Engineered's assignee, not in Balboa's capacity as surety. This meant that the SBA was in effect funding the claim of Pre-Engineered (through its assignee Balboa), a party with whom the SBA had no contractual relationship. The District Court concluded:

---

any payments received by the surety from any other source.

**2.** The dispute apparently centered on Pre-Engineered's claims that Ball-Co was unjustifiably withholding payment on Pre-Engineered's invoices and Ball-Co's claims that Pre-Engineered was installing inappropriate equipment.

**3.** Two of Ball-Co's individual sureties were later dismissed because of their bankruptcy. The issue of the liability of the remaining sureties was severed from the trial in the District Court. They are not parties to this appeal although they did submit an appellate brief and their attorney managed to inject his views at oral argument as a "very interested amicus."

What Balboa is attempting to do is sue as assignee, in one breath, and collect as surety in another breath; or "to have its cake and eat it too." We cannot allow this use of public money to finance this litigation. Thus we find that this matter must be dismissed as a violation of public policy.

Alternatively, the District Court held that as Pre-Engineered's assignee, Balboa had no standing to sue for the monies allegedly due Pre-Engineered.

Because of the dismissal, the District Court did not address the merits of Pre-Engineered's (Balboa, assignee) claims against Ball-Co, nor did it rule on Ball-Co's counterclaims. Balboa ultimately secured Rule 54(b) certificates to prosecute this appeal.

### The Bond Guarantee Program

The District Court held that Balboa's suits violated public policy because public money was used to finance the litigation and because Balboa was seeking a double recovery—i.e., it sought to recover from Blair monies for which it already had been reimbursed by the SBA. In actual fact, there is no unfair dealing or ethically questionable effort behind Balboa's attempt to recover on Pre-Engineered's Miller Act claim. We believe that the District Court's holding rests on a faulty interpretation, if not a complete misunderstanding, of the statutory scheme underlying the SBA Surety Bond Guarantee Program.

The purpose of the SBA program—congressionally established and undoubtedly legitimate—is explained above. Here we concern ourselves with the mechanics of the program. Section 694b(a) of title 15 of the United States Code provides that "[t]he [Small Business] Administration may, upon such terms and conditions as it may prescribe, guarantee and enter into commitments to guarantee any surety ... against loss, as hereinafter provided, as the result of the breach of the terms of a bid bond,

payment bond, performance bond, or bonds ancillary and coterminous therewith...." The implementing regulations define "loss" to mean "any and all liability, damages, court costs, counsel fees, charges and expenses of whatever kind or nature which the surety shall or may at any time, sustain or incur by reason, or in consequence, of having executed the bond or bonds guaranteed by the SBA." 13 C.F.R. § 115.6(c) (1976).[4]

█ Momentarily putting aside any ancillary concerns, such as those expressed by the District Court, and analyzing the facts of this case solely in light of these statutory provisions, it is clear that Balboa's suits are of the type contemplated by the SBA surety bond program. When Pre-Engineered either walked off the job or defaulted as a result of its dispute with Ball-Co, Balboa faced significant liability on its performance bond. Indeed, it recognized its liability by financing the completion of the job. The expenditures made in satisfaction of this liability qualified as "losses" under 13 C.F.R. § 115.6(c). Thus, to the extent of 90% of Balboa's expenditures, the SBA faced similar liability. Through its loan/advances to or on behalf of Pre-Engineered and its taking an assignment of Pre-Engineered's contractual rights, Balboa undertook to perform its principal's obligation to Ball-Co and avoid a default on Pre-Engineered's sub-subcontract. As would any other surety who has in effect undertaken to perform its principal's contract, Balboa now merely seeks to be reimbursed through the prosecution of the Miller Act causes of action assigned to it by Pre-Engineered.

█ As the SBA points out in its amicus brief, Balboa—again in full keeping with sound practices of industrial suretyship—has an affirmative statutory and contractual obligation to mitigate losses covered by the Surety Bond Guarantee Pro-

---

**4.** The 1976 regulations, since modified in 1981, were in effect when the SBA guaranteed Balboa's surety bonds.

gram,[5] and Balboa's Miller Act claims represent an available and judicially honorable means of mitigating those losses. The attorney's fees expended by Balboa in prosecuting its suits clearly are "counsel fees ... which the surety shall ... incur by reason, or in consequence, of having executed the bond or bonds guaranteed by SBA." *See* 13 C.F.R. § 115.6(c) (1976). As such, they represent losses that are reimbursible by the SBA, as provided by the SBA's program regulations.[6] Thus, not looking beyond the statutes or regulations and with a full view of the principles and practice of suretyship, we find Balboa's suits to be authorized by the Miller Act, contemplated by the Surety Bond Guarantee Program, and, as between Balboa and the SBA, properly reimbursable by the SBA.

### Champerty Rears Its Ancient Head

We next consider the concerns expressed by the District Court. The trial judge held that Balboa's suits violated public policy because public monies, i.e., SBA funds, were used to finance the litigation. His concern was apparently that the SBA's reimbursement of Balboa's attorney's fees was champertous.

Champerty is an extremely ancient doctrine which developed early in the history of the common law, but whose roots go back even further. Its scope has generally been constricted in the past century. At present, in some jurisdictions, the doctrine does not exist at all at

common law and a statutory scheme is all that remains. *E.g., Alexander v. Unification Church of America,* 634 F.2d 673 (2d Cir.1980) (applying New York law).

A champertous agreement is one in which a person without interest in another's litigation undertakes to carry on the litigation at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation. 14 C.J.S. Champerty and Maintenance § 1 (1939). *See* Restatement of Contracts § 540(2), § 542(1) (1932). Champerty is a special form of maintenance, which is essentially officious intermeddling in a suit in which one has no interest by assisting a party in its prosecution. Champerty is maintenance with compensation derived from the proceeds of the suit. 14 C.J.S. Champerty and Maintenance §§ 2 and 3 (1939). *Martin v. Morgan Drive Away, Inc.,* 665 F.2d 598, 603 (5th Cir.) (footnotes omitted), *cert. dismissed sub nom. Morgan Drive Away, Inc. v. Samford,* 458 U.S. 1122, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982).

▌ From the outset, we are positive that there is no champerty here. The problem with the District Court's conclusion is that it ignores the SBA's substantial interest in Balboa's litigation. For an agreement to be champertous, the financier must have no interest in the litigation to be financed. Here, the SBA, through its agreement with Balboa, stands to recover through Balboa's suit the money which it

---

5. Paragraph 8 of the standard form SBA Guarantee Agreement provides:

Surety [here, Balboa] agrees that if any suit or claim is brought or instituted against surety upon said bond or bonds, Surety shall inform SBA of the same within a reasonable time of receipt of the summons and complaint or claim in the Surety's home office. Unless otherwise agreed, Surety shall take charge of all claim matters arising under said bonds; determine its liability and the amount thereof; compromise, settle or defend any claim or suit; and, take such action as it deems necessary to minimize the loss.

*See also* 13 C.F.R. § 115.6(d) (1976) (surety shall "take such action as it deems necessary to minimize loss").

6. Balboa cannot and does not seek to recover through its Miller Act claims attorney's fees partially paid by the SBA merely because those attorney's fees constituted "losses" within the meaning of the Surety Bond Guarantee Program. Whether Balboa can recover its attorney's fees as part of a Miller Act claim or a state law contract claim we need not here decide. But the mere fact that the SBA may bear a portion of the attorney's fees incurred by Balboa because they are reimbursable counsel fees within the meaning of the program, *see* 13 C.F.R. § 115.6(c) (1976), does not make either this lawsuit or Balboa's recovery of such fees from the SBA reprehensible, unethical, or champertous.

paid to Balboa under the surety guarantee program. As we pointed out above, under the program regulations, 90% of any monies recovered from Ball-Co by Balboa, the so-called "salvage," must be turned over to the SBA to point that the SBA is fully reimbursed.

> SBA's agreed percentage of loss payment shall commence after the surety has incurred and paid the lesser of (1) the first $500 of loss of [sic] (2) the amount of bond premium as reduced by the guarantee fee. Before remitting to SBA its pro rata share of salvage, the surety may credit itself with the deductible amount: *Provided, however,* That unless or until SBA has been reimbursed for its loss under its guarantee of such bond, contract proceeds or collateral held by the surety may not be so credited.

13 C.F.R. § 115.11(b) (1986).[7] Thus, through Balboa's suit, the SBA stands to recover its own funds and its reimbursement of Balboa's attorney's fees cannot be champertous.

### No Double Recovery

This analysis also disposes of the District Court's objection that Balboa is seeking to recover from Ball-Co monies for which it had already been reimbursed by the SBA. It is apparent that of Balboa's recovery, 90% would go to the SBA (up to the limit of the SBA's loss), and that any recovery above Balboa's loss would go to Pre-Engineered under the terms of the Balboa-Pre-Engineered agreement. Balboa simply

7. The 1976 version of the SBA regulations, in effect when Balboa and the SBA entered into their guarantee agreement, are silent about the obligation of Balboa to reimburse the SBA from any "salvage" proceeds. However, Balboa and the SBA agree as a contractual matter, and Ball-Co has not contested, that such an obligation exists.

8. Despite this assertion, Ball-Co's brief contains the following information:

does not seek and cannot obtain a double recovery.

Blair, USF & G, and Ball-Co argue strenuously that Balboa, suing only in its capacity as Pre-Engineered's assignee, cannot bring a Miller Act claim to recover for losses actually incurred by the SBA or by Balboa in its capacity as Balboa, i.e., *not* in its capacity as Pre-Engineered's assignee. They claim that Pre-Engineered was fully compensated according to the terms of its contracts with Ball-Co[8] and that the remaining monies sought are actually cost overruns which are Balboa's and the SBA's losses, not Pre-Engineered's.

■ This argument is unavailing. Pre-Engineered claims that it was not fully compensated under its contracts with Ball-Co and it assigned this claim—a Miller Act claim—to Balboa. The District Court specifically found that assignment to be valid and we agree. If Balboa is seeking to recover under the guise of a Miller Act claim certain items not recoverable under the Miller Act, then the District Court should exclude those items from Balboa's recovery. But the District Court has never reached the merits of the underlying dispute and we cannot make such a determination on appeal until we have before us an opinion on the merits from the District Court, an opinion so far assiduously avoided. The fact that any recovery by Balboa in its capacity as Pre-Engineered's assignee ultimately may go to Balboa in its capacity as Pre-Engineered's surety and thence to the SBA is insufficient to defeat Balboa's claims before they are adjudicated.

| | | |
|---|---|---|
| Final Contract Amount Phase I | $305,457.00 | |
| Final Contract Amount Phase II | 121,764.15 | |
| | | $427,221.15 |
| Less payments by Ball-Co | | |
| Phase I | 256,572.48 | |
| Phase II | 109,979.61 | |
| | | $366,552.09 |

Apparently, Ball-Co believes that these amounts "reasonably reimburs[ed] Pre-Engineered for the labor and materials actually furnished to the jobs." Ball-Co also claims that because Balboa paid to Pre-Engineered the difference between the above totals as well as a little extra, "Pre-Engineered has not suffered a loss; it has been more than paid in full and thus has no further rights to payment." We find Ball-Co's arith-

### Standing, No Standing: What Have We Been Doing?

As a final gasp, this brings us to the District Court's remaining reason for dismissing Balboa's claims. The District Court, without elaboration, held that Balboa, as Pre-Engineered's assignee, lacked standing to sue for "the items sought to be collected in this litigation." We reiterate that any items sought by Balboa which are not recoverable by Balboa as assignee under the Miller Act, or otherwise, should not be recovered in this case. But as long as the assignment of Pre-Engineered's Miller Act claims to Balboa was valid, as it was, Balboa has standing to assert those claims and to have them adjudicated on the merits.

We therefore vacate the order of dismissal and remand for decision on the merits.

VACATED and REMANDED.

metic to be as deficient as its understanding of suretyship—the fact that Balboa paid Pre-Engi-neered's invoices in no way excuses Ball-Co from paying the full contractual amounts owed.